**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Case No: 1:14-CR- 00186** |
| **v.** | : | |
| | : | **The Hon. Ketanji Brown Jackson** |
| **DANIEL MILZMAN,** | : | |
| | : | **Sentencing Date: November 10, 2014** |
| **Defendant.** | : | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

*In ten years, I want to look back and fondly remember all my experiences, but I want to be in a place where I can enjoy these memories and be able to put them behind me, content and fulfilled.* The defendant, Daniel ("Danny") Milzman spoke these words to nearly 500 Walt Whitman High School classmates just over two years ago, when he was selected to be one of four student speakers at Commencement exercises in June 2012.[1] Mr. Milzman had every reason to be optimistic at graduation – the major depression he developed as a high school sophomore had abated with medication and counseling, he had been admitted to Georgetown University based on his exemplary academic, extracurricular, and public service record at Walt Whitman, and he was on the path to fulfilling his dream of becoming a medical doctor. As Mr. Milzman addressed the Class of 2012, he never expected that the memories he later would "look back" upon would include months of incarceration in the austere Administrative Segregation unit of the District of Columbia Jail or an appearance before this Court as a criminal defendant to be sentenced for the federal offense of Unregistered Possession of a Biological Agent or Toxin (18 U.S.C. § 175b(c)(1)).

---

[1]  The text of Mr. Milzman's commencement speech is attached as Exhibit A.

Through a preindictment guilty plea entered under Federal Rule of Criminal Procedure 11(c)(1)(C), Danny Milzman has accepted full responsibility for the fact that, in his Georgetown dormitory room in February 2014, he produced a small quantity of ricin from castor beans, acetone, and Epsom salt using a method published on the Internet.  Mr. Milzman self-reported his actions to a friend at Georgetown and cooperated fully with the ensuing police investigation. Mr. Milzman's actions were the product of a psychiatric condition – major depression – which led him at first to explore and then, regrettably, to act upon a misguided plan to have ricin on hand as a means for his own potential suicide.  As Adam Lowy, M.D., a psychiatrist at the Psychiatric Institute of Washington who evaluated Mr. Milzman after his arrest, concluded: "Mr. Milzman is a young man suffering from recurrent major depressive disorder leading to recent suicidal behavior resulting in his synthesis of ricin as a means of suicide. . . . [H]e neither exhibited nor expressed any plans or behavior consistent with violence towards others during the course of his hospitalization."[2]  Mr. Milzman's treating psychiatrist, Anne Hayes, M.D., similarly has concluded that Mr. Milzman "is not now nor never was a danger to others."[3]  The scores of letters that have been submitted to the Court in support of Mr. Milzman, which repeatedly emphasize Mr. Milzman's kindness and compassion for others, fully corroborate the conclusions of Dr. Lowy and Dr. Hayes.[4]

Based on the aberrational nature of Mr. Milzman's criminal conduct and his timely acceptance of responsibility, the government and the defense have agreed that the appropriate sentence for Mr. Milzman's offense is one that falls within the range of twelve months and one day to 24 months of incarceration, followed by three years of supervised release.  *See* Plea

---

[2]  Dr. Lowy's report is attached as Exhibit B.
[3]  Dr. Hayes's report is attached as Exhibit C.
[4]  The letters of support written on Mr. Milzman's behalf are attached as Exhibit D.

Agreement (Dkt. #31) at 2.   Mr. Milzman already has served more than seven months of essentially solitary confinement at the District of Columbia Jail.   He has been released from his protective cell for only one hour each day, was only permitted to step outside into fresh air two months into his confinement and, as discussed below, has endured conditions that would be difficult for any mature adult, much less a twenty-year-old young man in need of psychiatric care and family support, to bear.   In a word, Mr. Milzman has been *punished*.   He has learned difficult lessons about the consequences of a reckless act and the importance of strict compliance with his medication requirements.   He will never appear before this or any Court again.   We respectfully submit that it is now time for Mr. Milzman to heal.   It is time for him to receive the psychiatric treatment he needs, to be reunited with his supportive family, to resume his education, and to return to the promising professional path on which he embarked from Walt Whitman High School just two years ago.   We respectfully ask the Court to impose a sentence of one year and a day of incarceration, to be followed by three years of supervised release conditioned upon community service and mental health treatment.

## I.      The Advisory Sentencing Guidelines Range

Mr. Milzman does not dispute that the advisory Sentencing Guidelines range is, as the Presentence Investigation Report (PIR) and the Plea Agreement reflect, 30 to 37 months imprisonment.   The applicable Guideline, section 2M6.1, applies to a broad range of offenses that include the unauthorized possession of a "biological agent" or "toxin" under 18 U.S.C. § 175b.   Under section 2M6.1, the base offense level for Mr. Milzman's offense is 22.   After applying a three-level downward adjustment for acceptance of responsibility under section 3E1.1 (which the government agrees Mr. Milzman has earned, *see* Plea Agreement at 4), Mr.

Milzman's total offense level is 19.  Mr. Milzman's lack of a criminal record places him in Criminal History Category I.  The resulting advisory Guidelines range is 30 to 37 months.

As already noted, however, through entry of a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the government and the defense have agreed  that the applicable advisory Guidelines range exceeds the sentencing range that would serve the purposes of federal sentencing in the circumstances of this case.  The parties further agree that an appropriate and just sentence under 18 U.S.C. § 3553 instead would fall within the range of one year and a day to 24 months of incarceration.  For the many reasons discussed next, Mr. Milzman urges the Court to accept the parties' agreement and to find that a sentence of one year and a day is "sufficient, but not greater than necessary" to serve all the purposes of federal sentencing.  *See* 18 U.S.C. § 3553(a).

## II.    The Other § 3553 Factors

Section 3553 requires a sentencing court to impose a sentence that is "sufficient, but not greater than necessary" to comply with four purposes of federal sentencing.  18 U.S.C. § 3553(a).  Those four purposes are the need for the sentence imposed (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  In addition, § 3553 requires district courts to consider the following factors in imposing sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide

restitution to any victim(s). 18 U.S.C. § 3553(a)(1)-(7). For the reasons that follow, Mr. Milzman submits that an incarceration sentence of one year and a day, followed by three years of supervised release conditioned on community service and mental health treatment, comports fully with the sentencing objectives and principles set forth in § 3553.

      A.    *The Nature and Circumstances of Mr. Milzman's Offense*

A meaningful discussion of the nature and circumstances of Mr. Milzman's offense must be twofold. It must describe Mr. Milzman's criminal conduct, but it also must describe certain medical setbacks that Mr. Milzman experienced just as his sophomore year at Georgetown was to begin. Those setbacks set the stage for the criminal conduct that followed and demonstrate that the events of February 2014 that have brought Mr. Milzman before this Court do not reflect any underlying criminal character or propensity on Mr. Milzman's part. To the contrary, the events can only be characterized as a plea for help from a young man who had temporarily lost ground in his battle with mental illness.

      1.    <u>Mr. Milzman's Criminal Conduct</u>

As the factual proffer at the change-of-plea hearing established, Mr. Milzman's offense took place on the Georgetown University campus. Mr. Milzman began his sophomore year at Georgetown in January 2014 after taking medical leave for the Fall semester. On the evening of March 17, 2014, Mr. Milzman reached out to a fellow student and friend, who also was a Resident Advisor (RA) at Georgetown, to speak confidentially. Mr. Milzman confided to the RA friend that he had produced ricin in his dormitory room over a period of four days during the previous month. Mr. Milzman showed the RA friend the alleged ricin, which was double wrapped in plastic bags. Mr. Milzman made a number of statements to the RA friend about how

he made and hid the ricin and asked hypothetical questions about the consequences of giving it to someone.

When Mr. Milzman left the RA friend's room, the RA friend contacted the authorities. In the early morning hours of March 18, 2014, police and fire department personnel confronted Mr. Milzman in his dormitory room. Mr. Milzman cooperated fully with the investigators. He told them (1) how he made the ricin (with locally-purchased castor beans, acetone, and Epsom salt, using a home method published on the Internet), (2) when he made the ricin (more than one month earlier), (3) where he stored the ricin (in the bottom drawer of his desk where no one would accidentally find it), (4) where he disposed of the leftover raw materials (in a dumpster outside his parents' home), and (5) why he made the ricin (for use on himself in a suicide attempt in which the cause of death could be mistaken for mere illness). PIR ¶¶ 20-21.[5] The authorities recovered the plastic bags containing the alleged ricin from Mr. Milzman's bottom desk drawer. PIR ¶ 22. Subsequent laboratory analysis showed that the substance in the bags contained about 947 micrograms of ricin (123 milligrams of powder with a ricin concentration of 7.7 micrograms per milligram, *i.e.*, less than 1 percent). *Id.*[6]

---

[5]   Mr. Milzman's cooperation with the investigating authorities also included consenting to searches of his computer and cell phone records.

[6]   The Statement of Offense to which the government and Mr. Milzman have agreed states that information contained within a 2008 United States Army textbook (the *Textbook of Military Medicine, Medical Aspects of Chemical and Biological Warfare*) indicates that the quantity of ricin that Mr. Milzman produced could have been lethal to a human being if it were inhaled or injected. For the Court's information, however, several experts who independently reviewed the government's ricin analysis on Mr. Milzman's behalf reached different conclusions. For example, medical toxicologist Anne-Michelle Ruha, M.D., concluded that the ricin produced by Mr. Milzman "was far from the purified form of the toxin which is considered highly lethal and dangerous" and that "[i]f the entire 123 mg of castor bean extract possessed by Mr. Milzman had been ingested, it is unclear that any toxicity would have ensued." *See* Exhibit E. Similarly, medical toxicologist Steven B. Bird, M.D. concluded that no testing had been done to determine whether the ricin produced by Mr. Milzman was of a quality that potentially could be toxic to humans or even animals, that the crude substance likely had a large particle size that would cause

2.      The Setbacks that Led to Mr. Milzman's Criminal Conduct

Mr. Milzman received his first psychiatric evaluation in 2004 at the age of ten.[7]  His provisional diagnosis at that time was Generalized Anxiety Disorder.  With outside support for his executive functioning skills, Mr. Milzman managed this condition and performed well both in and outside of school.  During his sophomore year in high school, however, Mr. Milzman's mental health deteriorated.  That year, Mr. Milzman revealed to his family and friends for the first time that he was gay.  As Mr. Milzman's father, Dr. David Milzman, writes in his letter to the Court, "[Danny] had been tormented and unsure of his true feelings for years and this 'coming out' was no easy thing for him."  Alan Goodwin, principal of Walt Whitman, similarly observes that "[Danny] did struggle with depression as he wrestled with his sexual identity, but was courageous about his openness."  Mr. Milzman's mother, Dr. Colette Magnant, further explains in her letter that "[Danny] became depressed during his sophomore year and spent the last 3 years of high school in and out of depressive episodes."

In January 2010, Dr. Hayes determined that Mr. Milzman was experiencing symptoms "consistent with a diagnosis of major depression," including "passive suicidal ideation without intent or plan."  *See* Exhibit C.  Dr. Hayes ultimately prescribed the medication Wellbutrin.  *Id*.  Consistent medication and counseling controlled Mr. Milzman's depression during high school.  *Id*.  When Mr. Milzman would neglect to use his medication as prescribed, however, he would "suffer[] a resurgence of the depressive symptoms."  *Id*.  As a high school student, Mr. Milzman was open and honest about his diagnosis and need for treatment and even wrote about these matters in his college admission essays:

---

little toxicity, and that the absence of any delivery device made the substance "an improbable or impossible method of poisoning."  *See* Exhibit F.

[7]   Mr. Milzman's psychiatric history is described in the previously-referenced reports from Dr. Lowy and Dr. Hayes, which are attached as Exhibits B and C.

> *In 10ᵗʰ grade, I was stricken with major depression. I recently read a quote that summed up my feelings at this time completely: "depression is when you stop being sad about something and start being sad about everything."*

With his depression under control, Mr. Milzman had academic and personal successes during his freshman year at Georgetown. He declared majors in Mathematics and Physics and earned nearly straight A's (a cumulative 3.752 grade point average) in his first two semesters.[8] After excelling in "Quiz Bowl" competitions in high school, Mr. Milzman was surprised to learn that, unlike many prestigious colleges, Georgetown had no Quiz Bowl team. Mr. Milzman devoted substantial time and energy outside of the classroom during freshman year to forming Georgetown University Quiz Bowl (GUQB). The approval process was cumbersome, requiring coordination of funding, paperwork, scheduling, recruiting, and all matters associated with the new club. Mr. Milzman single-handedly formed GUQB, and it was granted access to University benefits in November 2013. GUQB is one of Mr. Milzman's proudest achievements. A classmate, Joshua Tsung, describes in his letter to the Court how, after Mr. Milzman realized his "dream" of creating GUQB, he "drew in many different people from all over campus onto the team with his charisma and dynamic passion." Mr. Milzman also continued his family's public service tradition (discussed *infra*) at Georgetown through participation as an inaugural member of the Georgetown Secular Student Alliance (GSSA), a campus group that promotes community activism outside religious channels. Mr. Milzman was an active participant in GSSA's discussions and events, including several service events to make sandwiches for distribution to homeless D.C. residents.

The positive momentum Mr. Milzman built during his freshman year was interrupted by his contraction of a severe case of mononucleosis during the summer before sophomore year.

---

[8]  Mr. Milzman's unofficial Georgetown transcript is attached as Exhibit G.

The Milzman family traveled to Europe over that summer with Danny's paternal grandfather, Joseph Milzman. As "Grandpa Joe" explains in his letter to the Court, the trip was triggered by Joseph's then-recent liver failure, which left him not knowing if he "would live another 6 months." Joseph subsequently received a liver transplant. As he writes to the Court, however, he made it through the strenuous European trip only because of hands-on help from Danny, who "transport[ed] [him] by wheelchair and made certain that [he] saw all the sights while caring for [his] well-being." The trip took a physical toll on Danny who, as described in his mother Colette's letter, became so "exhausted and incredibly sick" from mononucleosis that he had to withdraw from Georgetown on medical leave for the Fall semester. Dr. Hayes explains that Danny's medical illness also "both psychologically and most likely, physiologically, contributed to a deterioration of his stable mental status." Exhibit C.

When Mr. Milzman returned to Georgetown in January 2014, he was physically and mentally weakened and "somewhat out of synch," according to his brother Jesse Milzman (who is also a Georgetown student). Mr. Milzman felt detached from his former social connections at school and his academic performance slipped. As Jesse explains, "A slumping academic and social life was weighing on Danny. I just never realized how much." In addition, Mr. Milzman's mononucleosis had dramatically altered his sleeping schedule toward increased sleep, which resulted in Mr. Milzman taking his medications less regularly. Against the backdrop of his underlying depression diagnosis, Mr. Milzman's declining academic confidence, low self-esteem, and medication disruption were a dangerous combination. As Dr. Hayes explains,

> Rather than seek out help from his parents or other trusted adults, it appears that Danny became inward focused and describes the manufacturing of ricin as a symbol of gaining mastery over something, at a time when he felt that he had limited control over anything in his life. He describes being tormented with suicidal thoughts during this time and the knowledge of having a substance in his

possession that he could use for self harm was reassuring, again a symbol of control when he felt he had none.

3.    Analysis

Mr. Milzman understands that the nature of the offense to which he has pled guilty is serious.  He recognizes that his conduct on the Georgetown campus created a potential danger to other students and staff, caused unnecessary fear in the school community, and significantly disrupted the campus.  He deeply regrets that he was unable to cope with his depression in a more responsible and productive manner.  He knows from past experience that he is vulnerable to relapse when he fails to abide strictly by his medication regime.  He also understands that it is his *obligation* as a student and citizen who knows he is burdened with major depression to manage that condition vigilantly so that it does not manifest itself in conduct that would present any conceivable danger, or the perceived threat of a danger, to others.  As discussed *infra*, Mr. Milzman has always placed a high value on serving the interests of his community – whether it be through public service missions, student government, or leadership positions on his athletic teams.  In this one instance, he let his community down.  He deeply regrets his failing and accepts full responsibility for it.

But the Court's statutory directive in this sentencing proceeding is to consider not only the "nature" of the offense of conviction as an abstract matter, but also the real-life "circumstances" of it as a concrete matter.  *See* 18 U.S.C. § 3553(a)(1).  In this regard, we submit that the full circumstances surrounding Mr. Milzman's crime are significantly mitigating.  First, Mr. Milzman's criminal conduct was the product of a deteriorating mental condition that caused him to contemplate self-harm.  He had no intent to harm or threaten any other person.  Indeed, the many letters that have been submitted on Mr. Milzman's behalf demonstrate that it is inconceivable to anyone who knows Mr. Milzman that he would be violent or pose a threat to

anyone.  Even in the inherently rough environment of high school ice hockey, one of Mr.

Milzman's coaches (Andrew Wolfe) writes, "Danny was clearly in the non-aggressive camp"

and "[w]e could barely get him to hit an opposing player."  Second, Mr. Milzman *self-reported*

his conduct to an individual (his RA friend) who he knew would be obligated to report the

incident.  As so many of Mr. Milzman's supporters write, his conduct clearly was a "cry for

help" from a young person experiencing debilitating self-doubt.  No fact evidences that

conclusion as plainly as Mr. Milzman's spontaneous confession.  Third, Mr. Milzman's conduct

was isolated and aberrational.  He has had no prior contact with the criminal justice system and

has never been subject to disciplinary action in school or any other setting.  Mr. Milzman's father

sums up the mitigating circumstances of his son's crime in his letter to the Court:

> Danny is an exceptionally talented and well-loved 20-year-old who made a
> mistake as a depressed 19-year-old college student.  This single act is so out of
> character that there still is absolute disbelief that the past seven months and 13
> days have actually occurred.

We ask the Court to give due weight to the mitigating circumstances surrounding Mr. Milzman's

offense as it evaluates the appropriate sentence to impose.

     B.    *The History and Characteristics of Mr. Milzman*

     The history and personal characteristics of Mr. Milzman also weigh heavily in favor of a

one-year-and-a-day sentence.  Mr. Milzman is still very young, but he already has impressed the

adults, teachers, coaches, and peers who know him with the breadth of his accomplishments and

the depth and sincerity of his compassion for others.  Mr. Milzman has distinguished himself as a

strong student and an enthusiastic athlete, but he has not been content to devote his energies

exclusively to academics and personal endeavors.  Instead, in keeping with his family's

community-service tradition, he has undertaken leadership roles in student government and has

volunteered significant time to charitable missions and events.  Moreover, as so many of the

letters written in support of Mr. Milzman show, he also has consistently extended himself to others in "quieter" ways throughout his life, as when a new teammate has difficulty integrating with the team or a teacher is bedridden after surgery.  The image that emerges from Mr. Milzman's life to date is that of a young man with great potential for personal achievement but also a keen sensitivity to his obligations to the community and the needs of his friends.  Mr. Milzman is the sort of young man who, having done wrong once, deserves a second chance.

Mr. Milzman was born in 1994 in Arlington, Virginia, and grew up in the Washington D.C. area.  His parents, Colette Magnant and David Milzman have been married for 26 years. They are both medical doctors.  Dr. Magnant is a breast surgeon and the Director of the Breast Cancer Program at Sibley Hospital, which she started in 1996.  Dr. Milzman is an emergency physician who practices clinically at the Washington Hospital Center and teaches at Georgetown Medical Center.  Mr. Milzman has two older brothers, Matthew (age 23) and Jesse (age 21). Matthew is a Georgetown graduate, and Jesse is a senior at Georgetown studying mathematics.

The Milzman family is extremely close-knit and supportive.  Despite their busy medical careers, Colette and David have made time to stay heavily involved in their sons' lives.  One family friend (James Murphy) writes about how he and his wife "always were amazed at how involved Dave and Colette [Milzman] were, and how much energy they had, and expended." David coached all of his sons' soccer teams, including Danny's team (the "Purple Haze") for 13 years.

Colette and David also instilled in their sons a commitment to community service.  As David explains in his letter,

> Danny grew up in a house where providing for others was expected as a pay back for our own good fortune to be rewarded with intelligence and opportunity to serve others.  He believes that the gift of being skilled to assist others is a responsibility.

The Milzman family made service trips to American Indian reservations in the Southwest during multiple summers, as part of the "Running Strong for American Indian Youth" program. Colin O'Brien, a Walt Whitman teacher and sponsor of the school's American Indian Culture/Service club who accompanied the Milzmans on two of those trips, writes that "Danny was a model student on both trips, and was helpful at mentoring children on their reading and writing skills" as well as assisting with painting and work in the community garden. The Milzman sons also accompanied their parents on humanitarian medical missions, including one to Haiti in the aftermath of the 2010 earthquake. The family commitment to public service clearly is deeply engrained in Danny – in his high school commencement speech, as Danny looked back with his classmates on the significant events of the previous four years, "raising over $50,000 for Leukemia & Lymphoma Month" made his short list of highlights. *See* Exhibit A.

Mr. Milzman has always excelled academically. His mother writes that Danny "loved school from an early age, relishing in his interactions with other kids and the intellectual challenge of learning." Mr. Milzman was a National Merit semifinalist and earned strong grades. But the predominant impression that comes through in the letters that have been submitted to the Court is that, separate and apart from grades, Mr. Milzman thrives on the sheer excitement and stimulation of learning, analysis, and debate. Amy Liu, a physics professor at Georgetown, writes that "[e]ven among the cohort of high achievers" enrolled in her courses, "Danny stands out for his quick mind, his curiosity, and the joy he takes in discovery." Thomas Sneddon, the head coach of the Walt Whitman ice hockey team on which Mr. Milzman played, explains in his letter how Mr. Milzman surprised him and the team with his "impressive" knowledge of art history as the team toured Europe during one Spring Break. Dr. Anthony Napoli, a family friend, writes about an occasion when he was in the car with David and Danny

Milzman when Danny was approximately 12 years old. As the adults discussed recent news about China, Danny joined the discussion and "shared an extremely advanced and clear critique of the Chinese political system." Even in jail, Mr. Milzman has found ways to stay intellectually engaged. His friend, Emily Massey, writes that "[Danny] has been re-reading his physics textbook and studying French" and recently sent her "a glossary of the best extinct 19th century English words he found in [the works of Thomas] Hardy." Mr. Milzman's mother is right on the mark in describing Mr. Milzman as "somewhat of a Renaissance man."

Mr. Milzman also has distinguished himself in school through his active participation in a range of extracurricular activities. In addition to the Quiz Bowl team already discussed, Mr. Milzman has been active in both student government and athletics. He served as one of three class officers during his sophomore and junior years at Walt Whitman, and he was elected Vice President of the Student Government Association during his senior year. As Mr. Milzman's father writes, "[Danny] felt a strong need to serve others and share some of his ideas to improve student experience and thus nearly felt compelled to work in student government every year in secondary and high school."

Mr. Milzman played ice hockey for four years in high school and was voted Captain of the junior varsity team during his junior year and Alternative Captain of the varsity team his senior year. As his coaches and teammates make clear in their letters, Mr. Milzman's contributions to the team extended well beyond the rink. Head coach Sneddon writes that while Mr. Milzman "was never a great hockey player," he "was one of the most well rounded, kind-hearted, and courageous young men I have had the pleasure of coaching over the past 11 years" and "became a real leader to his teammates" through his "positive personality, sense of humor, and desire to make sure everyone had a good time." A teammate, Sonja Stojic, emphasizes how

Mr. Milzman made the few female players on the team "feel welcomed" and writes that "Danny Milzman became the heart of Whitman hockey in how he took players under his wing both on and off the ice."

Mr. Milzman's readiness to take others "under his wing" is a common theme of the letters that have been submitted on his behalf.  The letters contain countless anecdotes of individuals, adults and peers alike, who have been touched by Mr. Milzman's kindness and empathy, rare qualities in such a young person.  As nonexhaustive examples,

- Walt Whitman history teacher Wendy Eagan describes how Mr. Milzman visited her multiple times in the hospital and a nursing facility following major surgery "and helped me through that situation with his unfailing good humor, interesting conversation and healing consideration."

- Walt Whitman Quizbowl coach Laurie Safran describes how Mr. Milzman "help[ed] me gain my footing as a first-time coach, struggling to find my way as a leader of a group of brilliant young men."

- Family friend Dr. Harinder Dhindsa describes Mr. Milzman's "caring and compassionate nature towards" the Dhindsa's young children and how, on a vacation, Mr. Milzman "immediately took [the children] under his wing to teach them how to stay safe in and around the ocean."

- Georgetown classmate Rory Eagan writes that Mr. Milzman often stops to talk to homeless individuals on M Street and exhibits kindness and charm that makes people feel "instantly at ease" and "enables a real connection to form."  He writes that Mr. Milzman is "constantly making friends and trying to brighten the days of everyone around him."

- Georgetown classmate Joshua Tsung describes how Mr. Milzman encouraged him to stay positive during their freshman year at a time when Mr. Tsung was discouraged both academically and socially.  Mr. Tsung writes that, without Mr. Milzman's support, "I wouldn't have gotten through freshman year by myself."

- High school hockey teammate Lucas Karron describes his freshman year on the team when the older players made him perform menial tasks and "made fun of [him] for being an immature freshman."  By contrast, Mr. Milzman "actively befriended" Mr. Karron and invited him into carpools and dinner gatherings with the team.  Mr. Karron writes that "[a]nyone close to [Danny] will attest to his unique empathy and kindness."

As these excerpts show, when David Milzman writes that his son "is a genuinely nice and caring soul," that characterization derives not from parental bias, but from reality.  In short, the "history and characteristics" of Mr. Milzman overwhelmingly support a one-year-and-a-day sentence.  Through deeds and actions undertaken over twenty years, Mr. Milzman has demonstrated his true character.  In various roles as a student, athlete, and citizen, he has shown that he is responsible, kind, and committed to improving the lives of others, ranging from American Indian students thousands of miles away to nearby classmates and teachers in need of solace or support.  Mr. Milzman's personal history demonstrates that the conduct that has brought him into the criminal justice system is truly aberrational and is solely the product of depression that, at a pivotal time, got the better of a young, responsible, and good-hearted individual.

D.     *The Purposes of Federal Sentencing*

As noted at the outset, Congress has identified four purposes of federal sentencing that must guide district courts in selecting a sentence within the statutory penalty range.  The sentence must be "sufficient, but not greater than necessary" to serve those purposes.  With these guideposts in mind, Mr. Milzman respectfully asks the Court to impose a sentence of one year and a day, to be followed by three years of supervised release conditioned upon community service and mental health treatment.

The first purpose of federal sentencing is "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  As discussed above, Mr. Milzman understands that he has pled guilty to a serious offense.  In deciding the type of sentence that will provide "just punishment," however, the Court should consider that the offense was isolated, resulted in no injury to any person, and was the product of depression

16

rather than malice or a violent disposition.  In addition, the Court should consider the degree to which Mr. Milzman has already been punished.  This young defendant has been incarcerated for more than seven months in extraordinarily harsh conditions.  As a few examples, when Mr. Milzman arrived at the Jail, he was strip searched, placed naked in a safety smock, and kept in a cold "safe" cell for more than 36 hours.  His current cell in the Administrative Segregation unit, where Mr. Milzman spends 23 hours each day, contains only a bed, sink, and toilet and did not have hot water for four months.  When he has not been in complete isolation, Mr. Milzman has been subjected to frightening and graphic homophobic epithets and threats from inmates, which correctional officers hear but tolerate.  Sleep is rare, due to constant loud noise emanating from other inmates and correctional officers as well as cell lights that periodically turn on during the night.  To be clear, Mr. Milzman does not contend that he should be spared punishment for his conduct or that he should be treated better than other inmates.  He contends, though, that he *has been* punished and that, as a result of his youth and sexual orientation, the nature of his incarceration has actually been *more harsh* than that experienced by many other inmates.

Moreover, Mr. Milzman will continue to suffer the consequences of his criminal conduct long after he leaves jail.  His enrollment at Georgetown – the product of his many years of hard work in high school and a source of pride for himself and his family – is in jeopardy.  Mr. Milzman must return to square one and persuade Georgetown and/or a new school that he is worthy of its investment and trust despite these events.  Mr. Milzman's public reputation also has been tarnished by this criminal case, as his arrest and guilty plea have generated substantial media publicity.  For a young man like Mr. Milzman who has tried throughout his adolescence to be an example of the positive potential of the younger generation, it is traumatic and upsetting to bear the new label of a criminal conviction.

The second purpose of federal sentencing is "to afford adequate deterrence to criminal conduct."  That goal also would be fully served by the sentence we recommend.  Mr. Milzman's crime has been duly punished through many months of harsh incarceration.  His incarceration and conviction have received widespread publicity. Any student or adult who contemplates experimenting with unauthorized toxins, whether as a result of depression or merely out of curiosity, will understand from Mr. Milzman's case that serious repercussions will follow from such conduct.

The third purpose of federal sentencing is "to protect the public from further crimes of the defendant."  Mr. Milzman presents no danger of recidivism.  Before this arrest, he had no contacts at all with the criminal justice system.  The record before the Court demonstrates that Mr. Milzman's crime was the result of a psychiatric condition that has been and can be successfully managed.  Mr. Milzman understands clearly and unequivocally that it is his responsibility to manage his depression diligently through medication and counseling in the future so that he never again is tempted to engage in desperate conduct that also is hazardous and illegal.  His months in isolation have provided him ample opportunity to reflect on these matters, and he has an entire community of family members, teachers, and friends who will support him going forward.  As Danny's brother Jesse writes, through incarceration, "[Danny] has sorted out his life and made sense of what went wrong and is truly repentant."

The fourth purpose of federal sentencing is to provide the defendant with needed training, medical care, or other correctional treatment.  Mr. Milzman's psychiatric needs can best be served in the community where his family and caregivers are available to him.  While Mr. Milzman does receive some psychiatric attention at D.C. Jail, it is infrequent, time-limited by virtue of the many other inmates the psychiatrist must see, and includes no group therapy or

sessions with a psychologist. With inpatient and/or outpatient treatment on supervised release, Mr. Milzman will receive regular care from psychiatrists, psychologists and counselors able to meet his needs through a greater variety of methods and on a schedule that will better advance his psychiatric recovery.

*We must use lessons from the past in the present to secure an enjoyable future.* These words from Mr. Milzman's high school commencement speech carry a more profound meaning to him now. Mr. Milzman stands before the Court with deep remorse for his past conduct and assures the Court that he has learned valuable lessons from his prosecution and incarceration that he will remember – and use – now and for the rest of his life. Mr. Milzman has both a renewed appreciation of the power of depression and a renewed resolve to address it consistently and responsibly. He has learned through this experience that he has a vast community of supporters on whom he can lean and that he must never again "go it alone" when the effects of depression set in. In imposing sentence, Mr. Milzman asks the Court to consider his youth, his positive contributions to his school and community over the years, the isolated nature of his criminal conduct, and the significant punishment Mr. Milzman already has received as a result of a single poor choice that he made and cannot reverse. In these circumstances, leniency is fully consistent with the Court's statutory mandate to impose a sentence that is "sufficient, but not greater than necessary" to serve the purposes of federal sentencing. We therefore respectfully submit that the appropriate sentence for Mr. Milzman is one year and a day of incarceration, to be followed by three years of supervised release conditioned upon community service and mental health counseling.

## <u>CONCLUSION</u>

Based on the foregoing reasons and any other that may appear to the Court, Mr. Milzman respectfully submits that the sentence described above is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

Dated: November 3, 2014                                 Respectfully submitted,


                                                        /s/ Danny C. Onorato
                                                        Danny C. Onorato (DC Bar # 480043)
                                                        Stuart A. Sears (DC Bar #977144)
                                                        Lisa H. Schertler (DC Bar #430754)
                                                        Schertler & Onorato, LLP
                                                        575 7th Street, N.W.
                                                        Suite 300 South
                                                        Washington, D.C.  20004
                                                        Telephone: (202) 628-4199
                                                        Facsimile: (202) 628-4177

                                                        *Counsel for Daniel Milzman*