## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **Case No. 1:14-CR-00186 (KBJ)** |
| | : | |
| **DANIEL MILZMAN,** | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing.  For the reasons stated below, the government requests that the Defendant be sentenced to a period of 24-months incarceration, followed by a period of three years of supervised release.

### BACKGROUND

*Procedural Background*

On September 15, 2014, Daniel Milzman entered a guilty plea to a one-count Information charging him with violating 18 U.S.C. § 175b, the unlawful possession of ricin.  The Defendant's plea represented the culmination of lengthy plea negotiations between Milzman and the government which ended in the parties reaching an agreement under Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure ("Rule 11(c)").  The following terms, among others, were negotiated as part of the Defendant's Rule 11(c) plea agreement: (1) the parties agreed that the appropriate sentence in this case would include a period of incarceration that fell between twelve months and one day to 24 months, and (2) the parties agreed that the Defendant's sentence would include a period of three years of supervised release.  At the September 15, 2014, plea hearing, the Court deferred its decision whether to accept the Defendant's guilty plea until the Court had reviewed the Presentence Report ("PSR") issued in this case.

*General Background Information*

Between February 13, 2014, and February 19, 2014, the Defendant performed a number of Internet searches on his personal computer, some of which were focused on the following key words and phrases: (1) "O-Toluc acid," (sic.) (2)"Phenylacetic acid," (3) "anarchist cookbook," (4) "Recipes for Disaster," (5) "Ricin," (6) "Ricin#Overdose," (7) "2003 Ricin letters," (8) "Lily of the Valley#Toxicity," (9) "2013 Ricin letters," (10) "incidents involving ricin," (11) "incidents involving ricin#April 2013. 2C Washington, DC," (12) "how to throw a tail," and (13) "Lose someone when being followed."  Also, during the period January 1, 2014, through March 18, 2014, Milzman used a Netflix account to watch various episodes of the television show, "Breaking Bad."  In approximately thirteen of the "Breaking Bad" episodes the Defendant watched during that time period, the plot contained references to ricin being used to injure or kill someone.

*Details of Defendant's Possession of Ricin*

The instant offense to which the Defendant stands before the Court relates to the Defendant's conduct of making and possessing a biological toxin—namely a deadly form of ricin.  Specifically, at approximately 8:30 p.m., on March 17, 2014, the Defendant sent a text message to a friend of his who happened to be a Resident Advisor ("RA") for the purpose of confirming the RA's availability to meet with him.  At the time, the Defendant was in the midst of his second year of undergraduate studies at Georgetown University and lived on campus, in a room in McCarthy Hall.  Subsequently, the Defendant met with the RA in the RA's dorm room on campus.  At the beginning of the meeting, the Defendant asked the RA whether their conversation would be confidential; the RA assured him that it would be confidential.  The

Defendant also ensured that the door to the RA's room was closed.  During the approximately 90-minute meeting between the RA and the Defendant, the Defendant produced two plastic bags from his backpack - one of which was inside the other bag (i.e., double wrapped) - and tossed the double-wrapped bags on the floor in front of the RA.  The plastic bags contained a gray powdery substance, which the Defendant told the RA was ricin and explained that the RA should not open the bags.  The Defendant subsequently told the RA that he had made his ricin over a period of four days during a school break and that making the ricin was difficult and that he would not want to make it again.

At some point during his conversation with the RA, the Defendant explained to the RA that the RA was the only person linking the Defendant to the ricin; that the Defendant had cleaned up all of the materials he had used to make the ricin; and that the Defendant had been hiding the ricin in his dorm room after he made it.  In addition, the Defendant asked the RA what the RA would do if the Defendant used the ricin on someone; the RA responded that the RA would have to report the Defendant and the incident to the police.  The RA directly asked the Defendant if he intended to use his ricin on another undergraduate student enrolled at Georgetown University which whom the Defendant had had a previous personal relationship— the defendant simply shrugged in response.  At this point, the Defendant reminded the RA that there would be no way to prove that the Defendant had made the ricin, paying particular attention to the Defendant's efforts to clean up after himself when making the ricin.  When the conversation between the Defendant and the RA was coming to an end, the Defendant used the RA's personal bathroom, located inside the RA's dorm room, to wash his hands.  The Defendant then left the RA's dorm room.

Subsequently, law enforcement officials were notified of the possible presence of ricin in the Defendant's dorm room.  Members of the Washington, D.C. Fire Department ("DC FEMS") and law enforcement officers went to the Defendant's dorm room and removed the Defendant and his roommate.  The Defendant was taken to a lobby located on the first floor of McCarthy Hall, where he voluntarily spoke with law enforcement and admitted that he had made ricin, bought castor beans in Bethesda, MD, which contained the ricin toxin, crushed the beans, pulled the pulp out, mixed it with acetone, and let it dry.

The Defendant further explained to law enforcement that he had mixed his substance with Epsom salt, and once the final substance was prepared, he placed it in a plastic baggie and put it in his desk drawer and bundled up all of the remaining materials and substances he used to make the ricin and threw them out in a dumpster outside of his parents' house.  While speaking with law enforcement, the Defendant said that his ricin could be found in his desk drawer, on the left-hand side.  He also said that he had made the ricin over a month ago and claimed that he intended to use the ricin on himself.  Meanwhile, DC FEMS discovered in the Defendant's desk drawer, a small plastic bag containing a powdery substance.

*Laboratory Analysis of Defendant's Ricin*

The substance recovered from the Defendant's dorm room was subjected to laboratory analysis by the Department of Homeland Security's National Bioforensic Analysis Center (hereinafter "NBFAC").  On May 21, 2014, NBFAC reported that the final results from its testing of a sample taken from the substance recovered from the Defendant's dorm room indicated that the sample tested positive for the ricin toxin.  Specifically, the total quantity of substance produced by the Defendant was 123 milligrams, and the concentration of active ricin

toxin was 7.7 micrograms per milligram.   Furthermore, the ricin toxin produced by the Defendant was not in its naturally occurring form and was of a quantity and type that was not reasonably justified to be used by an individual who had not obtained a registration as required by section 351A(c) of the Public Health Service Act.

According to the *Textbook of Military Medicine, Medical Aspects of Chemical and Biological Warfare* (Dept. of Army, February 29, 2008), the ricin toxin is contained in castor beans.   The ricin toxin extracted from castor beans takes the form of powder and can cause bodily harm if inhaled, injected, or ingested by an individual.   Moreover, per the *Textbook of Military Medicine, Medical Aspects of Chemical and Biological Warfare*, a lethal dose$_{50}$ of ricin, i.e., the amount of ricin that is sufficient to kill 50% of a population within a certain time, is approximately three to five micrograms per kilogram if the substance containing ricin is inhaled or injected and about 20 milligrams per kilogram if the substance is ingested by an individual. According to the calculations discussed in the *Textbook of Military Medicine, Medical Aspects of Chemical and Biological Warfare*, and in light of NBFAC's results of the analysis of the substance recovered from Milzman's dorm room, the ricin toxin produced by the Defendant could have been lethal to an average person weighing 220 pounds, if either inhaled or injected.

### UNITED STATES SENTENCING GUIDELINES CALCULATION

The parties have agreed that the Defendant's applicable United States Sentencing Guidelines ("USSG" or "Guidelines") Offense level is 19, which, with a criminal history of Category I, calls for a sentence of 30 months to 37 months.   Under the plea agreement, the parties have agreed not to seek a departure under the Guidelines.

**SENTENCING FRAMEWORK**

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  United States v. Gall, 552 U.S. 38, 49 (2007) (citation omitted). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," id. at 46, and are the "starting point and the initial benchmark," id. at 49.  The district court should next consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a).  Id. at 49-50. Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a).  Rita v. United States, 551 U.S. 338, 348-49 (2007).

The § 3553(a) factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

The Section 3553(a) factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment, (3) the Sentencing Guidelines and related Sentencing Commission policy statements, and (4) the need to avoid unwarranted sentence disparities.

## <u>ARGUMENT</u>

Here, the nature and circumstances of the offense are not only egregious, but more fundamentally, are extremely reckless and demonstrative of an extreme disregard for the safety of others.  Milzman made a deadly form of ricin in his public dorm room—a dorm room which he shared with a roommate and which was accessible to countless other unsuspecting students, who may have visited Milzman's dorm room.  It is a gravely serious matter when a person attempts to make ricin, a *biological toxin*, but this situation is heightened when the person's efforts of making ricin are done in a public dorm room shared with an unsuspecting roommate. Furthermore, the gravity of the situation increases when a person keeps his ricin in his dorm room—in a lower left-hand *unlocked* and *easily accessible* desk drawer.  Not only that, but the Defendant transported his bag of lethal ricin in his backpack when he visited his friend/the RA— he even through the plastic bag of ricin on the floor in front of the RA.  His actions were more

7

than cavalier; his actions could have resulted in countless tragedies.  The Defendant's actions of making ricin in his dorm room and carrying it in his backpack and throwing it on the floor in front of the RA not only jeopardized his own safety, but his actions compromised the safety of his roommate, the RA, and countless other students. The extremely reckless nature of the Defendant's crime did not give him pause at any point.

In addition to the incredibly reckless and extremely dangerous nature of the defendant's conduct with respect to making and maintaining a deadly form of ricin in his dorm room, there are three other particularly troubling aspects to the Defendant's crime.  First, this was not an impulsive act; rather, the Defendant methodically planned the details of his crime.  By the Defendant's own admissions to law enforcement, he undertook the following to carry out his mission of making ricin: (1) researched ricin recipes online; (2) researched how to lose a someone when being followed; (3) traveled to Bethesda, MD, to purchase castor beans; (4) engaged in the difficult and complicated task of making ricin—grinding castor beans, extracting the pulp, mixing the substance with Epsom salt, during a period in time when his roommate was out of town and Georgetown University had a school break; (5) ensured to protect himself during the process of making ricin by wearing safety goggles, gloves, and a face mask; and (6) discarded all of the evidence connecting him to the ricin in a dumpster located near his parents' house and away from campus.  In light of the aforementioned, it is hard to imagine how the Defendant's conduct could be characterized as a youthful, misguided, indiscretion or an emotional impulse.  It took time for the Defendant to successfully make his ricin and by his own admission to the RA, it was difficult to make ricin; yet, at no time did the Defendant abort his mission.  He researched how to make ricin.  He researched where to buy castor beans in

Bethesda, MD.   He researched how to lose someone when being followed.   He watched "Breaking Bad" episodes where ricin was used to injure or kill someone.   He assembled his materials, including safety equipment to protect himself from exposure when making ricin, and then he intentionally set forth making a deadly form of ricin.

The second troubling aspect of the Defendant's crime concerns the unclear and ambiguous nature of the Defendant's intended use for the ricin.   Although the Defendant maintains that he intended to use his ricin on himself in an attempt to commit suicide, the record in this case presents a much murkier scenario.   Based on the evidence obtained in this case, the government submits that the Defendant's intended use or purpose for making ricin is unclear— the only fact that supports the Defendant's suicide claim is the Defendant's statement to law enforcement.[1]

There is evidence contradicting the Defendant's purported claim of using the ricin for suicide.   For example, the Defendant's February 2014 Internet searches do not squarely support the defendant's suicide claim.   Further, the Defendant's fascination with the television show, "Breaking Bad," in particular, the episodes in which ricin is used to injure or kill another person (not to commit suicide).   The precautions the Defendant took to ensure his safety when he made his ricin and the steps the Defendant pursued to distance himself from the ricin also call into question the Defendant's claimed suicide intent.

In addition, the Defendant's conversation with the RA also suggests that the Defendant's intended use for his ricin was unclear.   Specifically, when talking with his friend, when the

---

[1] Although the Defendant may have suffered from mental health issues in the past, and may currently be suffering from mental health issues including suicidal thoughts, the government does not believe that these facts alone unequivocally support the Defendant's contention that he made the ricin to use in a suicide attempt.

Defendant would not have a reason to give a self-serving statement, the Defendant not only denied intending to use the ricin in a suicide attempt, but he also simply shrugged when directly asked whether he intended to use the ricin on a specific person with whom the Defendant once had a romantic relationship.  Further, when talking with the RA, the Defendant reminded the RA that the RA was the only person or thing that would link the Defendant to his ricin.  That reminder was a quasi-threatening response to the RA's statement that that RA would have to alert the police if the Defendant used the ricin on anyone.  Consequently, based on the evidence obtained in this case, the Defendant's intended use of ricin is simply unclear and there is much that calls into question the Defendant's purported suicide claim.

Finally, the actual substance which the Defendant made, i.e., a deadly form of ricin, is deeply troubling to the government and illustrative of the exceptionally dangerous nature of the Defendant's crime.  It is unchallenged that the Defendant's ricin could have killed someone if either injected or inhaled or could have caused serious bodily injury if ingested.  The Defendant was completely aware and knowledgeable about ricin's lethal properties, and knowing them, nonetheless engaged in this conduct.

Notwithstanding the egregiousness and extreme danger posed by the Defendant's conduct, the government recognizes a number of factors which mitigate the Defendant's involvement in this case.  First, the Defendant has accepted responsibility for his actions, thereby conserving government and court resources by forgoing a trial.  Second, other than the instant offense, the Defendant does not have a criminal history.  Third, since his arrest, the Defendant has cooperated with law enforcement in the instant case.  Finally, the Defendant has been incarcerated since his initial presentment on March 21, 2014.  Accordingly, the government

believes that a sentence of 24 months of incarceration appropriately punishes the Defendant, reflects the seriousness of this offense, while also contemplates the instant mitigation present in this case.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Defendant be sentenced to a period of incarceration of 24 months, followed by three years of supervised release. The government's request squarely achieves the primary goals of criminal law: deterrence for the Defendant and others, punishment, and rehabilitation.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney
Bar No. 447889

By:      _____/s/_____
MAIA LUCKNER MILLER
VA Bar 73221
FREDERICK YETTE
DC Bar 385 391
Assistant United States Attorneys
U.S. Attorney's Office
555 4th Street, N.W.,
Washington, D.C. 20530
Miller: 202-252-6737
Maia.Miller@usdoj.gov

## **CERTIFICATE OF SERVICE**

I certify that a copy of this appeal was sent via e-mail to counsel for the defendant.

_____/s/_____
Maia L. Miller
Assistant United States Attorney